IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

        v.                                  NO.  00-51-1
                                                 01-783-1
MICHAEL GRASSO

FILED

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

MEMORANDUM

Dalzell, J.                                  June 4, 2007

        We here consider the final disposition of funds that
were frozen almost eight years ago, well before the defendant's
indictment in this matter.  After honoring the priority 18 U.S.C.
§ 3612(c) requires for payments of penalties and restitution from
those funds, we are left with the question of disposing of the
$276,930.75 that is left.  Four claimants, asserting claims in
excess of $560,821, have filed statements of claim,[1] and on May
31, 2007 we convened a hearing to consider these claims in order
to make, at long last, final disposition of the remaining funds.

        As will be seen, the procedural history in this matter
is complex, and we rehearse it in some detail in order to put our
adjudication into proper relief.  We then turn to resolve the
threshold question of whether, in fact, all of these funds
belonged to the defendant, as all but one claimant assume.

_____

1.   Notwithstanding the May 8, 2007 deadline we imposed for
filing statements of claim, see Order of Apr. 17, 2007, at ¶ 2,
the Internal Revenue Service at the May 31, 2007 hearing sought
to assert a then-unliquidated claim.  As of this writing, the
IRS's claim, like Godot, has not appeared.  In any event, we deny
that esprit de l'escalier as inexcusably untimely; in light of
our disposition, that claim is in any event moot.

I.  Factual Background

    A.  Procedural History

On September 14, 1999, pursuant to the Anti-Fraud Injunction Statute, 18 U.S.C. § 1345, the Government filed a civil action and a motion for temporary restraining order ("TRO") against Michael J. Grasso, Jr. ("Grasso" or "Michael"), United States v. Grasso, Civ. A. No. 99-4622 (E.D. Pa.) (hereinafter "Grasso Civil").  The next day, Judge John R. Padova, as Emergency Judge, granted the motion for a TRO, which, inter alia, froze all of Grasso's accounts.  On October 5, 1999, the parties filed a "Joint Motion for Entry of Agreed Upon Preliminary Injunction" with essentially the same provisions as the TRO.  One day later, Judge Jay C. Waldman, the assigned Judge, granted the motion and entered the preliminary injunction in the form the parties submitted, which included a provision that the restraints would remain in effect until further order of the court or further stipulation of the parties.[2]

In February of 2000, Grasso was indicted on mail fraud, wire fraud and several hundred counts of money laundering in United States v. Grasso, Crim. No. 00-51 (E.D. Pa.) ("Grasso I").

---

2.  The injunction provided, as had the TRO, that "[t]he financial institutions and funds are hereby authorized and directed not to permit withdrawals or honor checks or claims for funds which result in a reduction in amounts on deposit or in any account of defendant."  Prelim. Inj. of Oct. 6, 1999, at ¶ 9.  It also enjoined Grasso and his agents from taking any action to transfer or otherwise dispose of any assets Grasso controlled, including accounts at Union National Bank, Janus Funds, PBHG Funds, Inc., Stein Rose Mutual Funds, Excelsior Funds, Union Planters Bank, Suntrust Bank, Washington Mutual Bank, and Harleysville Bank.  Id. at ¶ 8.

The New York law firm of Morvillo Abramovitz Grand Iason & Silberg initially represented him.  In November of 2001, Grasso was indicted on new charges related to an attempt to gain access to the frozen funds in United States v. Grasso, Crim. No. 01-783 (E.D. Pa.) ("Grasso II").  The court scheduled trial in Grasso I for February of 2002.  In December of 2001, Walter M. Phillips, Jr., then a partner of Hoyle Fickler Herschel & Mathes LLP, entered his appearance and took over the case from the Morvillo firm.  At Mr. Phillips's request, Judge Bruce W. Kauffman, who was presiding over Grasso I, released $200,000 from the frozen funds to the Hoyle law firm to be used for Grasso's representation on the pending criminal charges.

After a two-week trial in February of 2002, the jury convicted Grasso on all counts in Grasso I.  Grasso later entered a guilty plea on the obstruction of justice offenses in Grasso II, assigned to Judge Berle M. Schiller, and on June 21, 2002 that case was consolidated with Grasso I for purposes of sentencing.  Shortly before sentencing, Judge Kauffman recused and the consolidated sentencing went forward on February 3, 2003 before Judge Schiller, who sentenced Grasso to a total of 102 months' imprisonment (ninety-seven months in Grasso I and five consecutive months in Grasso II), imposed a fine and an assessment, and ordered restitution.  Judge Schiller simultaneously entered an "Order of Forfeiture and Forfeiture Money Judgment" against Grasso in the sum of $2,844,591.17, which was "made part of the sentence and included in the judgment."

Forfeiture Order of Feb. 3, 2003, at ¶¶ 4, 7.  That same day,
Judge Schiller released an additional $100,000 to the Hoyle law
firm for its representation of Grasso.

Grasso appealed his sentence.  He argued, _inter alia_,
that he was not guilty in _Grasso I_ of money laundering under the
Seventh Circuit's decision in _United States v. Scialabba_, 282
F.3d 475 (7th Cir. 2002), _reh'g en banc denied_, _cert. denied_, 537
U.S. 1071 (2002), and that the restitution and sentencing orders
were flawed.  Our Court of Appeals affirmed the money laundering
conviction and sentence, but remanded the matter for further
proceedings on the fine and restitution.  _See United States v.
Grasso_, 381 F.3d 160 (3d Cir. 2004).

Grasso petitioned for a writ of certiorari from the
United States Supreme Court, challenging his money laundering
conviction and sentence based on the split in the Circuits
_Scialabba_ presented.  He also challenged his money laundering
sentence under the then-recent case of _Blakely v. Washington_, 542
U.S. 296 (2004).  After the Supreme Court decided _Booker v.
United States_, 543 U.S. 220 (2005), it vacated the Third
Circuit's judgment in _Grasso_, and remanded the case for further
proceedings consistent with _Booker_ without addressing the merits
of the _Scialabba_ issue.  _See Grasso v. United States_, 544 U.S.
945 (2005).  On June 13, 2005, the Third Circuit issued an order
that "the sentence entered by the District Court is vacated and
the case is remanded to the District Court for resentencing."
Order of June 13, 2005 (3d Cir.).

In September of 2005, Judge J. Curtis Joyner, who was assigned Grasso Civil on Judge Waldman's death, dismissed that case with prejudice and by stipulation.  Judge Joyner also approved a "Stipulated Permanent Injunction" providing that: "All funds which were frozen in this matter by Court Order dated October 6, 1999, shall be distributed by Court Order in connection with the criminal case of United States v. Michael Grasso, CR 00-51-1...." Stip. & Order of Sept. 27, 2005, at ¶ 5.

The two criminal cases were reassigned to us when Judge Schiller recused in July of 2005.  The following month we resentenced Grasso to ninety-seven months imprisonment in Grasso I and increased the sentence in Grasso II by five months; we imposed fines and restitution, but did not order forfeiture.  We also ordered a mailing to be sent to a sample of Grasso's victims to test the practicability of restitution.  Our Court of Appeals affirmed the new sentence.  See United States v. Grasso, 197 Fed. Appx. 200 (3d Cir. Sept. 25, 2006).

In light of the promising results from the sample mailing, on June 5, 2006 we appointed a claims administrator to carry out the restitution program.  The next day we ruled on Grasso's motion to distribute the assets, which included a request to release certain funds to his mother, Mavin Honey Grasso ("Mavin"), and denied the motion without prejudice to its reassertion after the restitution program was completed.

During 2006 and early 2007, the claims administrator made restitution payments totalling $339,469.09 to just over half

5

of Grasso's victims.[3]  Having completed the restitution program
and satisfied the priority of 18 U.S.C. § 3612(c) (*i.e.*, special
assessment, restitution, then fine), we turned to the question of
how to disburse the over $275,000 remaining from the frozen
assets, which had never been subject to final adjudication.  We
ordered that "[b]y May 8, 2007 all interested parties shall FILE
statements of claim and state in detail the legal basis for their
asserted entitlement to any portion of the Remaining Funds."
Order of Apr. 17, 2007, at ¶ 2.  We convened a hearing on the
matter on May 31, 2007.  The remaining funds as of that date
totalled $276,930.75.  Before assessing their proper disposition,
we now summarize the claims of the four parties that submitted
timely statements of claim.

  B.  The Claims[4]

   1.  Mavin Grasso

  Mavin, Michael's mother, seeks $105,000 plus
unspecified interest, which represents the amount that she and
her late husband, Michael Grasso, Sr. ("Senior") invested in an
account in their son's name.  Mavin is a seventy-two-year-old
widow who lives with her son, Patrick.  From 1960 to 1980, she
worked at a delicatessen that she owned on 22nd Street and
Indiana Avenue in Philadelphia.  Her husband died in early 2001.

---

3.  Indeed, the 13,513 checks cashed out of the 24,117 disbursed
constituted almost exactly the success rate the sample
anticipated.

4.  None of the material facts concerning the asserted claims is
in dispute.

Senior was a truck driver until 1969, when the Veterans
Administration found him totally disabled because of a condition
resulting from his World War II service in Europe.

The undisputed testimony of Mavin and Michael is that,
in late 1998 and early 1999, Mavin and Senior decided to increase
their investment return by taking certificates of deposits as
they matured and buying shares in a mutual fund where their son
had an account.  On November 10, 1998, Mavin and Senior combined
$49,556.47 from their certificate of deposit at First Union
Corporation[5] with about $5,000.00 from their checking account,
and they directed First Union to issue a check for $55,000 to
"PBHG Large Cap 20 Fund."  See Mot. to Free Assets, June 16,
2000, Ex. G First Union Bank Statement (10/22/98-11/23/98); Ex. H
First Union Check #093005018 to PBHG.  On November 13, 1998, PBHG
received the check and used it to purchase 3,179.191 shares of
the Large Cap 20 Fund, which it placed in Michael's account.  Id.
at Ex. I PBHG Statement of Account Activity.

On January 28, 1999, Mavin and Senior directed First
Union to take $50,000 more from their account and issue a check
to "PBHG LARGE CAP 20 FUND."  Id. at Ex. J First Union Bank
Statement (1/1/99-1/31/99); Ex. K First Union Check #093005392 to
PBHG.  On February 1, 1999 PBHG received the check and used it to

---

5.  First Union had previously been CoreStates Bank, and Mavin
and Senior's bank records verify that they had a certificate of
deposit there since May of 1996.  See Mot. to Free Assets, June
16, 2000, Exs. D, E (Civ. A. No. 99-4622, docket entry # 27).
Several times, when the ten-month certificate of deposit matured,
they rolled it over for another ten-month period.  See id.;
see also Mavin Grasso Statement of Claim ¶¶ 10-15.

buy 2,098.196 shares of the Large Cap 20 Fund, which it again deposited in Michael's account.  Id. at Ex. L PBHG Statement of Account Activity.  Thus, as of February 1, 1999, Michael's parents had paid for 5,277.387 shares of the Large Cap 20 Fund that were deposited in his PBHG account.

The PBHG records authenticated at the hearing show that on May 25, 1999 Michael closed out the position in the Large Cap 20 Fund for $21.74 a share, and thus his parents' 5,277.387 shares were on that day worth $114,730.  Id. at Ex. M PBHG Statement of Account Activity.  With his parents' and his own proceeds, Michael immediately purchased shares in the PBHG Technology & Communication Fund at a price of $26.13 per share. Id.  Thus, Mavin and Senior's $114,730 purchased 4,390.739 of the 14,183.785 shares Michael acquired on May 25, 1999.

As noted, in September of 1999, all of Michael's assets, including the PBHG account, were frozen pursuant to the TRO and stipulated injunction.  As of the September 15, 1999 freeze order, Mavin and Senior's shares were worth $155,651.69.[6] They twice tried to recover their investments from the frozen assets.  On June 16, 2000, they filed a motion to free assets to allow them access to their shares of the Pilgrim Baxter Technology & Communications Fund, and they attached exhibits of statements from their bank and PBHG documenting their transactions.  On October 20, 2000, Judge Waldman, without

---

6.  The closing price on September 15, 1999 was $35.45.  See http://www.marketwatch.com/tools/quotes/historical.asp?date=9%2F1 999&symb=O (last visited on June 1, 2007).

convening a hearing, found in a brief Order in <u>Grasso Civil</u> that
"they have not shown that the Fund actually deposited the checks
they wrote or that the proceeds from the checks were deposited
into defendant's account and actually used to purchase the
claimed shares." <u>See</u> Order of Oct. 20, 2000.   Mavin and Senior
then filed a motion to vacate that Order.   In denying the motion
in a brief Order, Judge Waldman found that the deposit slips were
not a basis for reconsideration under Fed. R. Civ. P. 60(b)(1),
were not "newly discovered evidence" within the meaning of Rule
60(b)(2), and were (in his view) illegible in the pertinent
portions.   <u>See</u> Order of Feb. 23, 2001.

### 2.   <u>Hoyle, Fickler, Herschel & Mathes LLP</u>

From February of 2001 until April 8, 2005, Hoyle,
Fickler, Herschel & Mathes LLP, through its partner, Walter M.
Phillips, Jr., represented Grasso.   Mr. Phillips, senior
associate Kevin Kotch, and a junior associate performed the bulk
of the work.   When Mr. Phillips left the Hoyle firm in April of
2005, Grasso owed that firm $247,826.94 -- $247,101.21 in fees
and $725.73 in expenses -- which it now seeks to recover.   <u>See</u>
Hoyle Statement of Claim, Ex. A, List of fifteen invoices from
April 4, 2002 to Mar. 11, 2005; Hoyle Supp. Statement of Claim,
Ex. A Statement of payments and credits.   Those fees were related
to sentencing and the certiorari petition.

### 3.   Obermayer Rebmann Maxwell & Hippel LLP

When Mr. Phillips left the Hoyle firm in April of 2005, he moved to the firm of Obermayer Rebmann Maxwell & Hippel LLP. At Obermayer, Mr. Phillips continued to represent Grasso, who now owes that firm $192,667.50 in fees and $3,213.67 in expenses, for a total of $195,881.17.  <u>See</u> Obermayer Statement of Claim 6.  The Obermayer firm has not received any compensation for its representation.

The fees requested include time that Mr. Phillips and his colleagues spent on: (1) representing Grasso in the resentencing; (2) working on the appeal of the August 2005 sentence; and (3) addressing the issue of restitution.  The resentencing involved some issues not addressed at the original sentencing, including the interplay of the Supreme Court's decision in <u>Booker</u> and the now-advisory sentencing guidelines. The appeal of the August 2005 sentence also involved issues not presented in the original appeal, such as <u>Booker</u>'s import and the constitutionality of the increased sentence we imposed.  Because of the protracted and complex nature of the case and Grasso's potential exposure, Mr. Phillips asserts that his firm's fees and expenses were reasonable and necessary.

### 4.   Jenkins, Siergiej & Smith

Before the Government filed <u>Grasso Civil</u>, Michael F. Smith, Esquire, of Jenkins, Siergiej & Smith represented Grasso in "various miscellaneous matters . . . related to enjoining the Defendant from using the mails to carry out those activities that

10

ultimately resulted in the filing of the indictments." Jenkins
Statement of Claim ¶ 3. These matters included claims against
Grasso from the Internal Revenue Service and Lower Gwynedd
Township related to his business privilege taxes. Mr. Smith
provided services from August of 2001 until April of 2006, when
he finished Grasso's defense against the Township's tax claims
and filed the necessary tax returns for the years in question.
The Jenkins firm submits two invoices totaling $12,113.85: (1)
$1,945.00 from Lower Gwynedd Township (Invoice #064486, which
includes a previous payment of $1,100), and (2) $10,168.85 from
IRS Tax Lien (Invoice #064487, which includes previous payment of
$501.40). The Jenkins firm asserts that it "is entitled to be
compensated as such creditor to the funds held by the Court which
appear to be in excess of fines, penalties and restitution." Id.
at ¶ 8.


III. Analysis

The claimants have not cited any law, nor are we aware
of any, that governs the priority of claims as to frozen funds
where the financial aspects of a federal criminal judgment have

been satisfied.[7]  We therefore look to the equities to allocate the remaining funds.

A.   Mavin Grasso's Claims

We must first consider the claim of Mavin Grasso because she raises at the threshold the question of whether, in fact, all of the frozen funds were Michael's.  She contends now, as she has for many years, that the shares she and her late husband purchased through her son's account were meant to be investments for her and Senior, and were not a gift to her son. The Government, while it contends that Mavin has not substantiated her claim and relies on Judge Waldman's rulings, does not dispute the truth of her representation about the character of the transactions.

Ordinarily, a transfer of assets between a parent and a child is presumed to be a gift:

> If a parent furnishes the purchase money and title to property is taken in the name of a child, a presumption arises that the parent intended the funds to be a gift. . . . The

---

7.  As the Obermayer and Hoyle firms note, we do have discretion to release frozen funds to pay reasonable attorney fees and expenses.  See, e.g., Mitsubishi Int'l Corp. v. Cardinal Textiles Sales, Inc., 14 F.3d 1507, 1520 (11th Cir. 1994) (affirming district court's order releasing frozen funds to pay attorney's fees for civil case); Fed. Trade Comm'n v. World Wide Factors, Ltd., 882 F.2d 344, 348 (9th Cir. 1989) (affirming district court's release of frozen assets for reasonable attorney's fees in civil action); Fed. Trade Comm'n v. Amy Travel Serv., Inc., 875 F.2d 564, 575-76 (7th Cir. 1989) (affirming district court's release of funds frozen by permanent injunction to pay reasonable attorney's fees and expenses).  There is also no dispute that we have discretion to exercise our equitable powers finally to resolve what to do with this money.

presumption has its genesis in the
Restatement (Second) of Trusts, § 443, which
provides:

> Where a transfer of property is
> made to one person and the purchase
> price is paid by another, and the
> transferee is a wife, child, or
> other natural object of bounty of
> the person by whom the purchase
> price is paid, and the latter
> manifests an intent that the
> transferee should not have the
> beneficial interest in the
> property, a resulting trust arises.

Hornyak v. Sell, 629 A.2d 138, 140 (Pa. Super. Ct. 1993)

(internal quotation and citation omitted).[8]  Thus, under the

Restatement of Trusts, a resulting trust arises if the transferor

intends it to.  See Mermon v. Mermon, 390 A.2d 796, 798 (Pa.

Super. Ct. 1978) ("it is the intention of the payor at the time

of the transfer and not at some subsequent time which determines

whether a resulting trust arises") (quoting Comment a.

Restatement of Trusts 2nd, § 443).  One rebuts the presumption of

a gift by "clear, explicit, and unequiv[ocal] evidence" of a

contrary intention, thereby establishing the existence of a

resulting trust.  Id. at 799.

As noted earlier, in the context of seeking relief from

the stipulated preliminary injunction, Judge Waldman on October

20, 2000 denied Mavin and Senior's motion to release to them

their shares in Pilgrim Baxter Technology & Communications Fund,

---

8.  As the three Grassos involved here all live in Pennsylvania,
we look to the Commonwealth's law on this aspect of our problem.

which at the time of that Order were worth $318,943.28.[9]  It may
be that Judge Waldman came to this harsh conclusion because he
did not have the benefit of a hearing that would have revealed to
him, as it was to us on May 31, 2007, that no party disputed the
fact that Mrs. Grasso and her late husband had in fact remitted
two bank checks totaling $105,000 in favor of "PBHG Large Cap 20
Fund," and not in favor of their son, Michael.

        Both Mavin and Michael testified before us without
contradiction that these funds were intended only for his
parents' investment, and not as a gift to Michael.  See Hr'g Tr.
17:19-18:11, 28:6-29:11.  Michael understood that he was to
invest the funds with his own in the Pilgrim Baxter mutual fund
he thought most suitable.[10]  None of the money his parents
invested came from Michael or had anything whatsoever to do with
what ultimately turned out to be criminal on Michael's part.  In
short, there is no dispute that this couple, of very modest
means, entrusted these funds to their son for investment purposes
only.[11]  She relied on her son's advice that she would be better

_____

9.   The closing price of a share that day was $72.64.  See note 6
supra.

10.   Dividends and capital gain distributions were reinvested in
the mutual fund.

11.   When we asked Mavin if she gave the funds to her "son to
invest and watch over for you?" she answered, "Yes, I did."  Hr'g
Tr. at 17:19-21 (May 31, 2007).

                              14

served investing with him in shares which could appreciate in value.[12]

The shares that ultimately were invested in the Technology and Communications Fund thus belonged exclusively to the parents.  Under §§ 404 and 443[13] of the Restatement (Second) of Trusts and under Pennsylvania law,[14] a resulting trust has been in existence in favor of Mavin and Senior since their first check bought the first tranch of PBHG mutual fund shares on November 13, 1998.  Their part of the frozen funds was never Michael's.

But what, exactly, is this part worth today?  We know beyond peradventure that Mavin and Senior's shares were worth $318,943.28 when Judge Waldman, without a hearing, determined not

12.  As Mavin put it to us, "He [Michael] was saying the shares were being built up.  They were really taking off at the time." Hr'g Tr. at 17:25-18:2.

13.  In pertinent part, § 404 defines a resulting trust as arising "where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein."

14.  The Pennsylvania Supreme Court decision in Godzieba v. Godzieba, 143 A.2d 344 (Pa. 1958), is instructive.  Godzieba involved parents' purchase of real property for a son, based upon his oral promise to convey it back to his parents at a later date, and the Chancellor impressed a resulting trust in favor of the parents.  The Pennsylvania Supreme Court affirmed, holding, after citing § 404 of the Restatement of Trusts, that the son "held the property upon a resulting trust for his parents." Id. at 347.  The record here is palpably stronger in favor of a resulting trust than it was in Godzieba.  See also Fenderson v. Fenderson, 685 A.2d 600, 606 (Pa. Super. Ct. 1996) (holding resulting trust arose in favor of a man who had contributed one-sixth of purchase price toward a house, even though the only title owners were his mother and siblings).

to return the shares, which was well before Michael's criminal
trial.[15]  We also know from the published share value of the
mutual fund's successor -- Old Mutual Columbus Circle Technology
and Communication Fund[16] -- that as of the date of the hearing
the closing price was $14.02, which would have made 4,390.755
shares worth $61,558.39, a loss since October 20, 2000 of
$270,821.76.  It would be intolerably inequitable for Mavin to
suffer such a loss when she and her late husband had done
everything in their power to prevent it.  It may be all well and
good for the Government in 2000 to advise Judge Waldman, in
effect, that there was insufficient documentary proof that Mavin
and Senior invested the $105,000 in their son's care.  It is
quite another matter for a different Assistant United States
Attorney on May 31, 2007 not to dispute the authenticity of a

---

15.  With all due deference, it is a mystery to us how Judge
Waldman could write that Mavin and Senior "have not shown that
the Fund actually deposited the checks they wrote or that the
proceeds from the checks were deposited into defendant's account
and actually used to purchase the claimed shares" when all the
documentation attached to their motion confirmed the contrary of
everything Judge Waldman wrote.  To be sure, Judge Waldman's
language echoed the Government's views at the time.  See Mar. 1,
2000 Ltr. of AUSA Marilyn S. May to Sheldon S. Lustigman, Esq.,
attached as Ex. O to Mot. to Distribute Assets (docket entry
number 27) in Grasso Civil.  In any event, since the October 20,
2000 Order was entered without a hearing, in the context of a
preliminary injunction, and well before Michael's trial, it
palpably was not a final disposition of the matter.

16.  Old Mutual Advisor Funds II took over PBHG Funds some time
during the course of these proceedings.  See
http://www.phhgfunds.com/funds/FundDetail.asp?FundID=TCF0000000&p
=1 (last visited May 31, 2007).  The Old Mutual symbol for the
Technology and Communications Fund that the Grassos owned is
OBTCX.

single record that amply documents the reality, at all times, of

Mavin and Senior's contentions.[17]

It is true that, had the $105,000 been invested at,

say, five percent[18] since the assets were frozen on September 15,

1999 they would today be worth about $153,063.  It is also true

that the couple's shares on September 15, 1999 had a market value

of $155,651.69, which invested at five percent would be worth

$229,322.31 today.[19]  But there is nothing hypothetical about the

reality that by October 20, 2000 Senior was less than five months

from his death, Mavin was sixty-five years old, and the son who

was entrusted to invest their money could no longer touch those

_____

17.  See Hr'g Tr. at 24-25 (Court's colloquy with Mavin and AUSA
Ann Whatley Chain).

18.  We do not entirely pull this interest rate out of the air.
The problem of identifying an interest rate parallels the problem
of finding the date of Mavin and Senior's loss.  At the taking
date, September 15, 1999, the judgment rate of interest was
5.285%, and at the Judge Waldman decision date it was 6.241%.
See table following 28 U.S.C. § 1961 printed at West Federal
Civil Judicial Procedure and Rules 1021 (2007 ed.).  The rate we
have elected to use ratchets down from those cited because it is
conservative and reflects the lower rates the Federal Reserve
allowed after the September 11, 2001 attacks, which persisted for
much of the ensuing period.

19.  We use Excel software, and compound the interest daily, as
any money fund would.  It is curious that Mavin up to the May 31,
2007 hearing persists in referring to $105,000, when the value of
those funds was so readily ascertainable as long as the mutual
fund shares were unliquidated.  As we have shown, her claim at a
minimum is for $155,651.69 plus five percent interest compounded
through today, or $229,322.31.  The value of those same shares
when Judge Waldman declined to let Mavin and Senior take them was
almost $100,000 greater.  But Mavin's persistence in quoting the
untenably low $105,000 only confirms her lack of sophistication
on investment matters and her total dependence on others to
protect what she has accumulated over her life.  After September
15, 1999 there was, quite literally, no one who could look out
for her interests.

17

funds.  As of October 20, 2000, there is no question that Mavin
and Senior's interest totalled $318,943.28, and that, under the
circumstances Mavin and Senior faced on October 20, 2000, they
would scarcely have kept so large a portion of their modest means
in a technology mutual fund.  In short, it requires little
imagination to expect that, had the Government acted in 2000 as
it does now, Mavin and Senior would have had the shares and sold
them so the income could help meet the pressing needs of Senior's
remaining months and Mavin's retirement, not to mention assist
with the catastrophe their son, Michael, then faced.[20]

        These funds were always Mavin and Senior's.  They did
everything they could to get what was theirs, but faced a
Government indifferent to their plight and (apparently) to the
truth, as well as a tribunal that relied on that Government
without giving them the process they only now have received.
Though they should have on October 20, 2000 got their shares back
-- which at the time were worth $318,943.28 -- they had to wait
almost seven years for the simple truth of their case to be
recognized.  Following Justice Story's teaching that "equity

---

20.  There are no other dates that we realistically could use as
milestones to calculate the value of Mavin and Senior's interest.
Although we know Judge Kauffman released $200,000 to the Hoyle
firm in Grasso I, see Ord. of Dec. 12, 2001 (doc. paper 51), we
do not know the sources of the funds to pay that sum.  By
February 3, 2003, when Judge Schiller released another $100,000
to the Hoyle firm, he specifically referenced the PBHG Technology
and Communications Fund for half the funds to pay that amount
(see doc. paper 143 in Grasso I), but we know as late as April
18, 2005 that there were still investments in the "PBHG Fund"
from a Government motion, see id. doc. paper 161 and Judge
Schiller's April 20, 2005 Order granting that motion (id., doc.
paper 162).

will, for the purposes of justice, treat that to have been done, which ought to have been done," <u>Taylor v. Longworth</u>, 39 U.S. 172, 14 Pet. 172 (1840), we shall value their interest in the resulting trust as of October 20, 2000.

By now, however, we are $42,012.53 short of what the couple should have had in October of 2000.  We shall therefore treat the balance of the funds on hand as Mavin's by operation of the powerful equities we have found on this record.

B.   <u>Law Firms' Claims</u>

Against the weighty equities that tip so heavily in Mavin's favor, the law firms' fee requests pale.  Of the roughly $1 million that Grasso has accrued in paid and unpaid legal bills, the Government calculates that about $591,000 has already been paid -- $416,823 to the Hoyle firm,[21] $150,000 to the Morvillo firm through a home equity loan that was repaid through Grasso's accounts,[22] and about $25,000 to separate counsel in connection with the civil proceeding.  Thus, on top of the $566,000 that has been paid for Grasso's representation in the criminal matters, the law firms now seek an additional $455,821.96.

But Mr. Phillips, a most seasoned criminal defense practitioner, knew perfectly well what he was getting into when

---

21.  The Hoyle firm states that it received $416,823.19.  <u>See</u> Hoyle Statement of Claim 1 & n.1.

22.  As of the filing of the PSI, $100,000 of the loan was repaid through Grasso's accounts.  PSI ¶ 167.

he replaced the Morvillo firm.  And his partners at the Hoyle firm, and later at the Obermayer firm, are hardly naïfs.  Neither firm needs the Court's assistance in protecting their interests when they take on a new client, and thus neither presents any equitable claim that could conceivably eclipse Mavin's.

The Jenkins, Siergiej & Smith claim stands on no better footing than the other two firms.  As that firm's work had nothing to do with the criminal prosecution here, we are fortified in our conclusion as to its priority being subordinate to Mavin's claim.

### C.   The Government's Forfeiture Request

As to the Government's request for forfeiture, no forfeiture order exists.  To be sure, an order of forfeiture was part of Grasso's original sentence, but in its June 13, 2005 Order, our Court of Appeals directed that "the sentence entered by the District Court is vacated and the case is remanded to the District Court for resentencing."  Because at our resentencing we did not impose an order of forfeiture, there remains no such order in this case.

In any event, there is certainly no need or equitable reason to impose one at Mavin Grasso's expense.  As is by now abundantly clear, she is a wholly innocent bystander whose assets were held hostage for almost eight years with the Government's full support.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA                CRIMINAL ACTION

        v.

MICHAEL GRASSO                          NO.  00-51-1
                                             01-783-1

ORDER

AND NOW, this 4th day of June, 2007, upon consideration of the timely statements of claim of Mavin Honey Grasso; Hoyle, Fickler, Herschel & Mathes LLP; Obermayer Rebmann Maxwell & Hippel LLP; and Jenkins, Siergiej & Smith, the Government's response to these statements, the supplemental statements of the Hoyle and Obermayer firms, and after a May 31, 2007 hearing on this matter, and in accordance with the findings of fact and conclusions of law set forth in the accompanying Memorandum, it is hereby ORDERED that:

1.    The Statement of Claim of Mavin Honey Grasso is ALLOWED as calculated in the Memorandum;

2.    All other claims to the frozen funds are DISALLOWED; and

3.    The Clerk of Court shall DISBURSE all the frozen funds remaining in the Court's Registry in connection with this case to Mavin Honey Grasso, c/o Joseph J. Hylan, Esquire, 525 Swede Street, Norristown, PA  19401.

BY THE COURT:

_____
Stewart Dalzell, J.